**Moishe Meyer ROSEN,**
**Plaintiff-Appellant,**

v.

**The PORT OF PORTLAND; James**
**Hawley; and Steven C. Laxton,**
**Defendants-Appellees.**

No. 79–4141.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1980.

Decided March 5, 1981.

Filed April 9, 1981.

Elden M. Rosenthal, Portland, Or., for plaintiff-appellant.

Donald J. Morgan, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendants-appellees.

Before HUG and REINHARDT, Circuit Judges, and SMITH,* District Judge.

REINHARDT, Circuit Judge:

Moishe Meyer Rosen, chairman of Jews for Jesus, arrived at Portland International Airport by plane and started distributing religious literature in the airport terminal. He was arrested for violating an ordinance requiring advance registration by those desiring to exercise first amendment rights at the terminal.[1] The ordinance provides for

---

* Honorable Russell E. Smith, Senior District Judge, District of Montana, sitting by designation.

1. The ordinance is implemented by regulations. Both the ordinance and the regulations were enacted by the governing body of the Port of Portland and the regulations have the same force and effect as the ordinance. *The current regulations expressly define the activity to be regulated as "the exercise of the fundamental constitutional right of free expression"* (emphasis added). *See* note 2, *infra.* Prior to oral argument, the Port of Portland amended its ordinance and regulations. The parties agree, as do we, that our decision should address the

(1) one business day's notice of an intent to distribute literature, picket, demonstrate, or "otherwise communicate with the general public" and (2) advance disclosure of the names, addresses, and telephone numbers of the sponsoring person and "responsible" person.[2]

Rosen brought suit for declaratory and injunctive relief, claiming that the ordinance is unconstitutional on its face under the first and fourteenth amendments.[3] The district court upheld the ordinance and granted summary judgment for the defendants.[4] Rosen appealed.[5]

The distribution of literature is a form of communication protected by the first amendment. *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The first amendment is to be given full effect in the public areas of airport terminal buildings. *Kuszynski v. City of*

---

ordinance and the regulations, as amended. For convenience, we will refer to the ordinance and the regulations, as amended, as "the ordinance."

2. The ordinance, prior to its recent amendment, included a third requirement, that a copy of material to be distributed be filed in advance. When the ordinance was amended, this requirement was deleted. Therefore, we need not consider its validity.

The current regulatory scheme is as follows: Ordinance 203, as amended by Ordinance 266, provides in part:

Section 2.4 NON–COMMERCIAL ACTIVITY [n]o person shall distribute or display to the general public at the airport any written or printed material, or picket, demonstrate, or otherwise communicate with the general public at the airport except in the time, and place and manner prescribed by regulations adopted by the Port.

Paragraph 6 of the implementing regulations provides in part:

6. NON–COMMERCIAL ACTIVITY

6.1 Non-commercial activity is communication with the public on political, religious, social, economic or similar topics of general public interest. *Non-commercial activity is the exercise of the fundamental constitutional right of free expression.* The communication may be verbal or by distributing literature, picketing, demonstrating or other means. No donations or contributions may be requested, nor may any item or material be sold. The mere distribution of literature which in the text requests funds will be deemed a non-commercial activity as long as the funds are not accepted at the airport.

6.2 Any person may engage in non-commercial activity at the airport by giving notice to the airport manager at least one business day in advance of the planned non-commercial activity.

6.3 The initial notice given by any person shall be in writing and shall include:

(a) The name, address and telephone number of the person sponsoring the non-commercial activity, if any.

(b) The name, address and telephone number of the responsible individual to whom the Port should address any communications regarding the non-commercial activity.

(c) A general description of the nature of the planned non-commercial activity (*e. g.,* passing out leaflets, personal conversations, picketing, etc.).

(d) The number of individuals expected to participate and the date, hours and location at the airport of the non-commercial activity. (Emphasis added).

Paragraph 9 of the implementing regulations provides in part:

9. PENALTIES AND ENFORCEMENT

9.1 In addition to any penalties prescribed by Ordinance 203, as amended, or by law, any individual who willfully and knowingly violates the provisions of sections 2.2 or 2.4 of Ordinance 203, or sections 4 through 8 of these Regulations, may be prohibited by the Executive Director, upon recommendation of the Airport Manager, from engaging in non-commercial activity or the solicitation of funds, or both, at the airport for not more than six months.

9.2 Any individual prohibited by the Executive Director from engaging in non-commercial activity or the solicitation of funds at the airport on two or more occasions within a period of 18 consecutive months may be prohibited by the Executive Director, upon recommendation of the Airport Manager, from engaging in non-commercial activity or the solicitation of funds, or both, for a period of not more than 24 months.

3. Rosen brought suit under the first and fourteenth amendments to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction was based on 28 U.S.C. § 1343(a).

4. Defendants-Appellees are the Port of Portland, a public corporation of the State of Oregon and the owner of Portland International Airport, James Hawley, the manager of Portland International Airport, and Steven Laxton, a security officer at Portland International Airport.

5. We have appellate jurisdiction under 28 U.S.C. § 1291.

*Oakland*, 479 F.2d 1130 (9th Cir. 1973); *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921 (7th Cir. 1975). However, the regulation of activity that interferes with the normal use of an airport facility is a proper governmental function. The issue before us then is whether a public agency may regulate activity protected by the first amendment in the manner provided in the challenged ordinance.

The Port of Portland contends that the ordinance, although it affects the exercise of first amendment rights, is justified. The Port asserts the need for advance notice when activity potentially disruptive of normal airport business will occur, so that it may take adequate precautions to preserve the peace. It also suggests that advance notice may enable it to avoid the conflicts that might arise if several groups demonstrated at the same time. Finally, it argues that requiring the names, addresses, and telephone numbers of sponsoring and "responsible" persons will help it to assess the possibility of disruption and will assist in its efforts to make arrangements with those persons for the orderly and peaceful use of the airport's facilities.

Rosen contends that both the advance notice and the identification requirements of the ordinance have a "chilling effect" on free speech. He argues that a public agency may not compel an individual to register with local authorities as a condition to the exercise of free speech rights. He also urges that compulsory disclosure of the identity of sponsors and "responsible" persons is unconstitutional because those communicating with the public have a right to maintain their anonymity.

We begin with the general principles that govern the analysis of statutes or ordinances that regulate or infringe upon the exercise of first amendment rights. Any such law "must survive the most exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). *First*, the law is presumptively unconstitutional and the state bears the burden of justification. *Kuszynski v. City of Oakland*, 479 F.2d 1130, 1151 (9th Cir. 1973). *Second*, the law must bear a "substantial relation," *Gibson v. Florida Legislative Commission*, 372 U.S. 539, 546, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963), to a "weighty" governmental interest. *See Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1964). The law cannot be justified merely by a showing of some legitimate governmental interest. *Buckley v. Valeo*, 424 U.S. at 64, 96 S.Ct. at 656. *Third*, the law must be the least drastic means of protecting the governmental interest involved; its restrictions may be "no greater than necessary or essential to the protection of the governmental interest." *Baldwin v. Redwood City*, 540 F.2d 1360, 1367 (9th Cir. 1976).[6] *Fourth*, the law must be drawn with "narrow specificity." *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). *See also Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

Moreover, any law which imposes a "prior restraint" on the exercise of first amendment rights comes to this Court "with a heavy presumption against its con-

---

**6.** The court wrote:

> Careful consideration must also be given to whether the challenged regulation is either more inclusive or more burdensome than necessary to further legitimate governmental purposes. "In the First Amendment area 'government may regulate ... only with narrow specificity.'" *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976), quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328 [338], 9 L.Ed.2d 405 (1963). In addition, the regulation must be the least

> restrictive means available that would accomplish the legislative purpose. "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty.... If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Kusper v. Portikes*, 414 U.S. 51, 58–59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973)."

stitutional validity." *Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 317, 100 S.Ct. 1156, 1161, 63 L.Ed.2d 413 (1980), quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 558, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1975); *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1970); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1970). The presumption is heavier against "prior restraints," and the protection therefore greater, because "prior restraints on speech and publications are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. at 559, 96 S.Ct. at 2802.

With these general principles in mind, we turn to an analysis of the constitutionality of the specific requirements of the ordinance.

# I

## The Advance Notice Requirement

■ We find the requirement of advance registration as a condition to peaceful pamphleteering, picketing, or communicating with the public to be unconstitutional. The United States Supreme Court held more than thirty-five years ago that persons desiring to exercise their free speech rights may not be required to give advance notice to the state. *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1944). In *Thomas,* the Court said:

If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a

penalty for violating such a restraining order. So long as no more is involved than exercise of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. *We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.*

*Id.* at 540, 65 S.Ct. at 327 (emphasis added).

While *Thomas* preceded the cases cited for the general principles we noted earlier, it is consistent with the later first amendment cases, and it mandates our decision today. In *Thomas,* the Court classified the requirement of previous registration as a prior restraint. The Court recently characterized the holding in *Thomas* as follows: "*Thomas* held unconstitutional a prior restraint in the form of a registration requirement for labor organizers." *Buckley v. Valeo,* 424 U.S. at 81, 96 S.Ct. at 664.

The Port points to a few narrow exceptions to the *Thomas* rule in an attempt to justify its regulations. These exceptions all involve overwhelming governmental interests and precisely tailored regulations; none is applicable to the case before us.

The Port states, correctly, that advance notice provisions may be included in parade permit ordinances. *See, e. g., Cox v. Louisiana,* 379 U.S. at 558, 85 S.Ct. at 466. The governmental interest in regulating parades, when large groups use public streets and disrupt traffic by causing major arteries to be closed and transportation rerouted, is apparent.[7] However, the ordinance before us regulates far more than mass

---

7. Despite this admittedly substantial interest, the Supreme Court has, without exception, adhered to the principle that parade permit statutes be narrowly drawn. *See, e. g., Cox v. Louisiana,* 379 U.S. at 558, 85 S.Ct. at 466; *Edwards v. South Carolina,* 372 U.S. 229, 236, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1962); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The Court's adherence to this principle is a further indication that the parade case exception should be applied to cover only those instances in which the disruption of public facilities is equivalent to that inherent in parades on public streets.

conduct that necessarily interferes with the use of public facilities. It regulates all forms of communication with the public by groups and individuals. Any person who wishes to communicate with the public, by uttering a few words, by silently distributing literature, or "otherwise," is subject to regulation. The Port has failed to demonstrate any interest in regulating individuals or small groups that is comparable to that involved in the regulation of parades. Thus, the parade case exception simply does not apply.[8]

Next, the Port cites an exception permitting advance notice requirements for demonstrations in the environs of the White House. *See A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C.Cir. 1975); *A Quaker Action Group v. Hickel*, 421 F.2d 1111, 1119 (D.C.Cir. 1970). The exception was made because of the unique importance attached to assuring the safety of the Presi-

dent. The Port has no similar justification for regulating expression in the manner provided in the challenged ordinance.[9]

 Finally, the Port argues that some speakers, by the nature of their message, need extra police protection and that advance notice would be helpful. We acknowledge the legitimacy of the Port's interest and recognize that many of those who communicate with the public, whether they represent Jews for Jesus, the Ku Klux Klan, the Socialist Workers' Party, or the Moral Majority, may deeply offend or antagonize members of the public. We cannot agree, however, that this interest of the Port justifies the infringement of fundamental first amendment rights.[10] " '[A] function of free speech under our system of government is to invite dispute. It may indeed serve its high purpose best when it induces a condition of unrest, creates dissat-

---

**8.** The ordinance is patently overinclusive. Even if the advance notice requirement were justified for large groups, and we expressly decline to reach that question, it sweeps too wide in its regulation of individuals and small groups.

**9.** The Port cites two further cases in support of the advance notice requirement. Neither is helpful to its cause. First, it points to *Jones v. Board of Regents of the University of Arizona*, 436 F.2d 618, 622 n.1 (9th Cir. 1970), a case in which a panel of this court approved an injunction which included an advance notice provision. The injunction prohibited enforcement of a *no hand-billing rule against plaintiff*. In *Jones*, a requirement in the injunction that the specific plaintiff give advance notice was justified by the clearly demonstrated need to provide that particular individual with special protection. He had been beaten on two previous occasions when attempting to handbill. Second, the Port cites *Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir. 1968), for the proposition that the Second Circuit approved advance registration requirements in the case of a bus terminal. However, in *Wolin*, the court specifically declined to reach the question of the constitutionality of advance registration requirements. *Id.* at 94.

**10.** It is settled law that a state may not directly prohibit offensive speech. *See Edwards v. South Carolina*, 372 U.S. 229, 237, 83 S.Ct. 680 (1963); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Terminello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Cantwell v. Connecticut*, 310 U.S.

296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940). Similarly, the Port may not prohibit offensive speech indirectly by imposing advance notice requirements that have a chilling effect.

In this connection, we note paragraph 7.5 of the regulations, which provides:

7.5 No individual engaged in a non-commercial activity or a solicitation of funds shall:

(a) Use threatening language or gestures.

(b) Use language or gestures directed at a member of the public intended to embarrass, ridicule or harass that individual.

(c) Intentionally touch or make physical contact with a member of the public without prior consent to do so.

(d) Misrepresent the organization or cause he represents.

(e) Repeatedly attempt to communicate with, or solicit funds from, a member of the public who has indicated he does not desire further communication, or to make a contribution.

(f) Contact any member of the public who is either embarking or disembarking from a motor vehicle, or who is within the baggage security area.

This section deals with a number of different types of problems, ranging from physical assaults, to the proscribed areas for the exercise of first amendment rights, to prohibitions against certain types of speech. The latter category raises substantial constitutional questions. However, this section of the ordinance is not presently before us. Accordingly, we do not now consider its constitutionality.

isfaction with conditions as they are, or even stirs people to anger . . . .' *Terminello v. Chicago*, 337 U.S. 1, 4–5 [69 S.Ct. 894, 895–896, 93 L.Ed. 1131]." *Edwards v. South Carolina*, 372 U.S. 229, 237–238, 83 S.Ct. 680, 684 (1963). To preserve this important function, it is the duty of the state to protect, rather than restrict, those who express unsettling views. *Edwards*.[11] Thus, the problem of police protection must be addressed through methods that do not offend the Constitution.[12]

Advance notice or registration requirements drastically burden free speech. They stifle spontaneous expression. They prevent speech that is intended to deal with immediate issues. In addition, the ordinance before us requires every person who wishes to exercise his or her free speech rights to make a trip to the airport at least one business day in advance;[13] it requires the person to obtain a copy of the regulations and fill out the requisite forms with

the Port before the advance notice deadline. The overall effect of the advance notice requirement is seriously to discourage "political, religious, social [and] economic" speech. The Port's interest in knowing in advance what type of free speech activities may occur at the airport is insufficient to justify an ordinance so broad in its application and with so chilling an impact on the exercise of first amendment rights.[14]

 While we view the ordinance as imposing a "prior restraint" and treat it as such, we would reach the same result even if we did not so view it. The ordinance, for reasons which we have expressed previously, fails to meet the rigid standards applicable to *any* statutes or ordinances which regulate first amendment rights. We note that the ordinance lies somewhere between the classic prior restraint cases in which speech is totally prohibited, *see, e. g., New York Times Co. v. United States*, 403 U.S. 714, 91 S.Ct. 2141 (1971); *Near v. Minneso-*

---

**11.** In *Cox v. Louisiana*, 379 U.S. at 551, 85 S.Ct. at 462, the Supreme Court wrote:

Here again, as in *Edwards*, this evidence "showed no more than that the opinions which . . . [the students] were peaceably expressing were sufficiently opposed to the views of the community to attract a crowd and necessitate police protection." *Edwards v. South Carolina, supra*, [372 U.S.] at 287 [83 S.Ct. at 693]. Conceding this was so, the "compelling answer . . . is that constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Watson v. Memphis*, 373 U.S. 526, 535 [83 S.Ct. 1314, 1319, 10 L.Ed.2d 529].

**12.** We have no reason to believe that the Port of Portland will experience any great difficulty in dealing with this problem. The record in the court below is devoid of any specific instances in which the exercise of free speech rights led to violence. The vague, general statements in the affidavit of Appellee Hawley constitute an insufficient factual basis to support the governmental interests alleged by the Port. *See A Quaker Action Group v. Hickel*, 421 F.2d at 1118.

**13.** However, notice may be provided for a group by one of its members.

It should be noted that at least "one business day in advance" ordinarily means that notice must be given three days in advance if the activity is planned for a Monday and four days in advance if Monday is a holiday and the activity is planned for Tuesday, since the Air-

port administrative office is open only five days per week and written notice must be given to that office. However, registration papers remain on file for at least 12 months, and "[a]ny person [including groups] with a written notice on file may thereafter give oral notice of a planned non-commercial activity to the Airport Manager at least one business day in advance." *See* note 2, *supra*. The oral notice required of a person with a written notice on file may be given by calling the Airport Manager's office at any time, since whenever that office is closed, calls are automatically transferred to the Airport police office, which is always open and is authorized to accept oral notices from persons with written notices on file.

**14.** Moreover, the ordinance provides that persons who violate various of its provisions may be banned from exercising their first amendment rights for six months, or in the case of a second violation for 24 months. Since the Port may decide to attempt, once again, to amend its ordinance, we call its attention to *Vance v. Universal Amusement Co.*, 445 U.S. 308, 100 S.Ct. 1156 (1980), *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), and *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), *inter alia*, which make clear that total prohibitions of future expression are unconstitutional. However, we are not asked to, and therefore do not, expressly rule on the constitutionality of this part of the ordinance.

*ta*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1938), and the classic "time, place, and manner" cases in which the time, location, or volume of speech are regulated, *see, e. g., Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Viewed realistically, the ordinance imposes a "prior restraint" intended to permit efficient "time, place and manner" regulation. In this respect, it bears some similarities to the parade cases, and under some circumstances such a "prior restraint" is permissible. *See Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762 (1941). However, such exceptions to the "prior restraint" rule are narrowly limited, and carefully circumscribed, and are permitted only when the infringement is minimal and there is a compelling governmental interest which cannot be protected by any other means. First amendment rights constitute the heart of our system of democratic government. The dangers that exceptions to the "prior restraint" rule pose to our democracy are all too obvious. Any "prior restraint," therefore, must be held unconstitutional, unless no other choice exists.

## II

### The Identification Requirement

■ The requirement that those desiring to exercise free speech rights identify themselves and supply the names, addresses, and telephone numbers of sponsoring or responsible persons also has a "chilling effect" on free speech, and is unconstitutional. In *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the United States Supreme Court stated the basic rule of law that is applicable here. In that case, the Court invalidated an ordinance that prohibited the distribution of pamphlets unless they contained the names of the persons who prepared, distributed, and sponsored them. The Court held that the identification requirement of the ordinance imposed unjustified burdens on the right of free expression and violated the first amendment. The Court said:

> There can be no doubt that such an identification requirement would tend to

restrict freedom to distribute information and thereby freedom of expression . . . .

> Anonymous pamphlets have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all.

*Id.* at 64, 80 S.Ct. at 538. The specific reason which the Court stated for holding the ordinance unconstitutional was "identification and the fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Id.* at 65, 80 S.Ct. at 539.

The Port argues that the recent decision of the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) supports its contention that identification requirements are constitutional. We disagree. We do not read *Buckley* as modifying the *Talley* rule that the government may not compel those who speak or publish to identify themselves or their sponsors.

In *Buckley*, the Court held that provisions of the Federal Election Law limiting campaign expenditures violated the first amendment, but upheld provisions requiring disclosure to the Federal Election Commission by every person who makes "contributions or expenditures" aggregating over $100. The only challenge to the disclosure provision in *Buckley* was that it was overbroad in its application to minor parties and independent candidates; appellants argued for a blanket exemption for minor parties and independent candidates.

In *Buckley*, the Court held that the campaign contributions disclosure requirement was justified by the overwhelming governmental interests in informing voters and deterring corruption and undue influence—interests that the Court found essential to the " 'free functioning of our national institution.' " 424 U.S. at 66, 96 S.Ct. at 657. The Court then stated that the requirement imposed "insignificant burdens on individual rights," *id.* at 68, 96 S.Ct. at 658, but that if the requisite factual showing of "chill

and harassment" were made, the provision would be unconstitutional as applied, *id.* at 74, 96 S.Ct. at 661. Additionally, the Court noted that "disclosure requirements—certainly in most applications—appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68, 96 S.Ct. at 658. Thus, *Buckley* constitutes a narrow, limited exception to the general principles set forth in *Talley.*

The Port has no interest comparable to those protected by the Federal Election Law. The governmental interest in assuring that those who use the Portland airport are not inconvenienced is simply not of the same order as the governmental interest in protecting the integrity of our national electoral process. Moreover, the realities of "chill and harassment" inherent in the ordinance go far beyond those inherent in the case of the compulsory disclosure of campaign contributions. Although the disclosure provisions in *Buckley* apply to minority parties and candidates, their principal impact is on those expressing traditional political views. The ordinance, by regulating free expression in the public areas of an airport, affects most frequently those who advocate unpopular causes. It is those who seek to change the status quo who have historically taken to the streets or other public places to promote their causes. Those who are satisfied with our society as it is, normally use other forums. Because the expression of dissident or "unsettling"

views, by its very nature, invites retaliation and oppression, the identification requirement of the ordinance presents substantial dangers of "chill and harassment"[15] that simply do not exist in the case of compulsory disclosure of campaign contributions. Thus, the *Buckley* exception to the general principles set forth in *Talley* is inapplicable to the case presently before us.[16]

The Port seeks to bring its identification requirement within other narrow exceptions to the general rule. The Port cites the parade and White House cases for the proposition that the identification requirements are constitutional. For the same reasons that they were of no assistance to the Port's argument with respect to advance notice, they are unpersuasive here.[17]

Identification requirements impose heavy burdens on the exercise of first amendment rights. The right of those expressing political, religious, social or economic views to maintain their anonymity is historic, fundamental, and all too often necessary. The advocacy of unpopular causes may lead to reprisals—not only by government, but by employers, colleagues, or society in general. While many who express their views may be willing to accept these consequences, others not so brave or not so free to do so will be discouraged from engaging in public advocacy. The Port's interests underlying the identification requirement are insufficient to justify an ordinance so broad in its application and with so chilling an effect.

---

**15.** This "chilling effect" is compounded when registration forms identifying individuals with unpopular causes become governmental records that are kept on file for at least a year. (Paragraph 6.4 of the Regulations.)

**16.** We also note that, in contrast to *Buckley*, the identification requirement of the ordinance is not the least restrictive means of protecting the interests of the Port. *See, e. g.,* note 8, *supra*, and note 12 and accompanying text, *supra*.

**17.** The Port did not cite *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). In *Hynes*, the Court invalidated an ordinance requiring prior identification of door-to-door solicitors on the ground of vagueness. Although it did not decide the question, the Court suggested that a

narrowly drawn ordinance *might* survive constitutional scrutiny where the governmental interest to be served is "crime prevention." *Id.* at 617, 96 S.Ct. at 1759. In the majority opinion, Chief Justice Burger cited Justice Black's "view" that door-to-door solicitors may be regulated "in order to deter criminal conduct by persons 'posing as canvassers,' ...." *Id.* at 618, 96 S.Ct. at 1759. Nevertheless, only Justice Rehnquist failed to perceive a serious first amendment flaw in the Oradell ordinance. Whatever rule may ultimately be adopted with respect to identification requirements for door-to-door solicitors, we see no governmental interest in the case before us which is comparable to the protection of the right of citizens to be secure in their homes.

## III

### Conclusion

Both the advance notice and the identification provisions of the challenged ordinance violate the United States Constitution. Following the mandates of *Thomas v. Collins* and *Talley v. California*, we hold that persons desiring to exercise their free speech rights may not be required to give advance notice and to identify themselves and their sponsors to Port authorities. The governmental interests urged by the Port represent legitimate concerns, but they do not justify the ordinance's infringement of first amendment rights.

The order of the district court is reversed and remanded with instructions to enter summary judgment for appellant.

RUSSELL E. SMITH, District Judge, dissenting:

An airport is constructed for the purpose of facilitating the movement of people and their luggage to and from airplanes. The people who use airports are of necessity funnelled through narrow portals. They must travel in relatively fixed channels from the exit gate to the luggage carrousel; from the ticket counter to the security check; from the security check to the departure gate. These people are in a sense captives. They do not have the freedom to choose alternate routes, as do users of the city streets, nor the freedom to deviate from the route, once chosen, to avoid annoyance or disturbance. I think it is the duty of an airport board to make travel as convenient as possible for these captives.

However valuable the right to speak and proselytize in public places may be, some exercise of free speech can cause disturbances. Thus, a reaction could be expected to a Ku Klux Klan demonstration in the airport at Atlanta, Georgia, or to an anti-Irish demonstration on St. Patrick's Day in the airport at Butte, Montana. In the confines of an airport a demonstration by a sufficient number of people could cause an annoying congestion.

Certainly an airport manager, with advance notice of the nature of an anticipated demonstration and the number of people intending to demonstrate, could, by the employment and deployment of security forces, provide more effective protection for the demonstrators and the public than would be possible if no one was aware of the demonstration until it was taking place. Likewise, congestion could be minimized by the selection of passenger routes and by limitations upon the numbers of demonstrations permitted at given points at given times.

The ordinance here does not empower the airport authorities to censor or forbid any speech, and it abridges first amendment rights only in that it delays for one day (four at the very most) the exercise of the right to speak and it requires that those who would exercise first amendment rights make the effort to give the notice. I do not believe that the effect of the espousal of any idea is so rapid that a one-day, or even four-day, delay would have any serious effect upon a particular cause sought to be advanced or upon the general right to speak freely. I regard the extra effort required to give notice in much the same vein. If that extra effort is so onerous in the mind of the one who would speak that such extra effort would deter speech, then that same mind has placed a minimal value on the worth of the speech and the cause which the speech would espouse.

In any case of this sort the court must balance the restrictions on first amendment rights against the governmental purpose to be served. The majority strikes the balance in one way. I would strike it in another. In my opinion, the affidavit of the airport manager sufficiently discloses the public interest to be served, and the case is distinguishable from *Kuszynski v. City of Oakland*, 479 F.2d 1130 (9th Cir. 1973). *See Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

If the advance notice requirement is valid, then I believe that the identification provision is likewise valid. The affidavit of the airport manager indicates a need to

communicate with those who plan a demonstration to avoid problems before they occur. The affidavit likewise indicates that the ordinance has worked well in practice. Certainly it would be of value to the airport and to those who would speak if there were communication as to matters such as an emergency created by counterdemonstrations or confrontations. I believe that there is a purpose to be served by the identification requirement and that the case is not governed by *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).