785 F.2d 791
 54 USLW 2497
 JEWS FOR JESUS, INC., a California non-profit religious
corporation and Alan Howard Snyder a.k.a. Avi
Snyder, an individual,
Plaintiffs/Counter-defendants/Appellees,
v.
The BOARD OF AIRPORT COMMISSIONERS Of the CITY OF LOS
ANGELES; et al., Defendants/Counter-claimants/Appellants.
 No. 85-5808.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 17, 1986.
Decided March 25, 1986.
 
 Joel D. Covelman, Meserve, Mumper & Hughes, Los Angeles, Cal., for plaintiffs/counter-defendants/appellees.
 James R. Kapel, Asst. City Atty., Los Angeles, Cal., for defendants/counter-claimants/appellants.
 Appeal from the United States District Court for the Central District of California.
 Before: SNEED, ANDERSON, and ALARCON, Circuit Judges.
 ALARCON, Circuit Judge.
 
 
 1
 Appellants Board of Airport Commissioners and City of Los Angeles appeal the district court's summary judgment in favor of appellees Jews for Jesus, Inc. and Alan Snyder. The district court found that: (1) the Central Terminal Area at Los Angeles International Airport (the interiors of the eight passenger terminals) is a traditional public forum; and (2) Resolution 13787 which prohibits all First Amendment activities within the Central Terminal Area is unconstitutional on its face. The Board appeals primarily because it disagrees with the district court's finding that the Central Terminal Area is a public forum. We affirm.
 
 I. BACKGROUND
 
 2
 Plaintiffs and appellees (hereinafter Jews for Jesus) are Jews for Jesus, Inc., a non-profit religious corporation, and Alan Howard Snyder, a minister of the Gospel for Jews for Jesus. The defendants and appellants (hereinafter the Board) are the City of Los Angeles and the Board of Airport Commissioners of the City of Los Angeles, as individuals and as operator of Los Angeles International Airport (hereinafter LAX). The Board, pursuant to City of Los Angeles Charter Sec. 238.4, manages and controls all airports owned by the City of Los Angeles including LAX.
 
 
 3
 On July 13, 1983, the Board adopted Resolution No. 13787 (hereinafter the Resolution) which states in part:
 
 
 4
 NOW, THEREFORE BE IT RESOLVED by the Board of Airport Commissioners that the Central Terminal Area at Los Angeles International Airport is not open for First Amendment activities by any individual and/or entity;
 
 
 5
 ....
 
 
 6
 BE IT FURTHER RESOLVED that if any individual or entity engages in First Amendment activities within the Central Terminal Area at Los Angeles International Airport, the City Attorney of the City of Los Angeles is directed to institute appropriate litigation against such individual and/or entity to ensure compliance with this Policy statement of the Board of Airport Commissioners....
 
 
 7
 On July 6, 1984, Snyder was distributing free religious literature on a pedestrian walkway in the Central Terminal Area (hereinafter CTA) at LAX when he was approached by a uniformed Department of Airports peace officer. The officer showed Snyder a copy of the Resolution, explained that Snyder was violating the Resolution, and asked Snyder to leave. The officer warned Snyder that if he refused to leave the City would take legal action against him. Snyder stopped distributing the leaflets and immediately left the airport terminal.
 
 
 8
 On July 17, 1984, Jews for Jesus filed suit in district court seeking a declaration of their rights to distribute religious literature in public areas in the CTA. Jews for Jesus challenged the constitutionality of the Resolution under both the Federal and California Constitutions on three grounds: (1) that it is unconstitutional on its face because it totally bans First Amendment activities in a public forum; (2) that the Resolution is unconstitutional as applied to plaintiffs because it has only been used to ban certain kinds of communicative conduct such as leafletting by Jews for Jesus; and (3) that it is unconstitutionally vague and overbroad because the term "First Amendment activities" does not give guidance to officials or the public as to what activity is prohibited.
 
 
 9
 The matter came before the district court for trial on January 6, 1985. Counsel for all parties orally stipulated to the facts and the district court treated the trial briefs as cross-motions for summary judgment without objection from the parties. The district court ruled that the CTA is a traditional public forum, declared the total ban on First Amendment activities unconstitutional on its face, and declined to reach the other issues raised by Jews for Jesus.
 
 II. STANDARD OF REVIEW
 
 10
 Because the parties stipulated to the facts below, there are no factual issues on appeal. This court reviews de novo the district court's application of the law to the facts on free speech questions. Carreras v. City of Anaheim, 768 F.2d 1039, 1042 n. 2 (9th Cir.1985).
 
 III. DISCUSSION
 
 11
 The United States Supreme Court recently enunciated the proper analysis for a First Amendment issue. First, the court must decide whether the challenged activity or speech is protected by the First Amendment, for, if it is not, the court need go no further. Cornelius v. NAACP Legal Defense & Educational Fund, Inc., --- U.S. ----, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). If the speech is protected, the court must identify the nature of the forum, because the extent to which the government may limit access depends on whether the forum is public or nonpublic. Cornelius, 105 S.Ct. at 3446-47. Finally, the court must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. Cornelius, 105 S.Ct. at 3447.
 
 
 12
 The Board does not dispute that distribution of literature is a form of communication protected by the First Amendment. United States v. Grace, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Rosen v. Port of Portland, 641 F.2d 1243, 1245 (9th Cir.1981). Both parties agree that the determinative legal issue in this case is whether the CTA is a public forum. That determination will provide the standard we must apply when reviewing the constitutionality of the Resolution.
 
 
 13
 Jews for Jesus argue that the central terminal areas in airports are traditional public forums open to free expression. The Board asserts that a traditional public forum analysis is inapplicable because the CTA at LAX is a nonpublic area which has not been opened to First Amendment expression by the Board. The Board contends that it has operated the terminal facilities solely for airport-related purposes and has neither created a forum for expressive purposes nor opened the area for the debate of issues of public interest unrelated to the airport's intended uses. The Board's reliance on recent Supreme Court decisions in Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and Cornelius, 105 S.Ct. 3439 is misplaced. These cases do not concern the determination of traditional public forums. They address the separate and distinct issue whether governmental facilities that are not traditional public forums have been opened for First Amendment activities. See Perry Education Association, 460 U.S. at 46, 103 S.Ct. at 955 (interschool mail system is not a traditional public forum); Cornelius, 105 S.Ct. at 3450 (the Combined Federal Public Campaign literature is not a traditional public forum).
 
 
 14
 The Supreme Court recently described traditional public forums as "those places which 'by long tradition or by government fiat have been devoted to assembly and debate.' " Cornelius, 105 S.Ct. at 3449, quoting Perry Education Association, 460 U.S. at 45, 103 S.Ct. at 954. "Public streets and parks fall into this category." Cornelius, 105 S.Ct. at 3449. A principal purpose of traditional public forums is the free exchange of ideas. Cornelius, 105 S.Ct. at 3448. "In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " Grace, 461 U.S. at 177, 103 S.Ct. at 1706, quoting Perry Education Association, 460 U.S. at 45, 103 S.Ct. at 954. "Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." Grace, 461 U.S. at 177, 103 S.Ct. at 1706.
 
 
 15
 This court, like a number of other circuits, has addressed the First Amendment forum issue in the context of airport terminals and concluded that airport terminal buildings are public forums open to First Amendment activity. In Rosen v. Port of Portland, 641 F.2d 1243 (9th Cir.1981), the chairman of Jews for Jesus challenged an ordinance and implementing regulations enacted by the Port of Portland that required those persons seeking to "exercise ... the fundamental constitutional right of free expression" at the Portland International Airport terminal to register in advance and identify their sponsor. Id. at 1245 & n. 2. The district court upheld the ordinance and we reversed. We observed in Rosen that "[t]he first amendment is to be given full effect in the public areas of airport terminal buildings," id. at 1245, and held both the advance notice and the identification provisions of the ordinance unconstitutional. Id. at 1252.
 
 
 16
 In Rosen we relied on our earlier ruling in Kuszynski v. City of Oakland, 479 F.2d 1130 (9th Cir.1973), and cited with approval a Seventh Circuit decision, Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975) (hereinafter CAMP ). The ordinance challenged in Kuszynski provided that "[t]he use of the [Oakland] Airport for the purpose of exercising the right of free expression and communication ... shall not be allowed to impair or interfere with the transportation function of the airport. The exercise of such rights shall be in accordance with [certain rules and regulations]." Kuszynski, 479 F.2d at 1130-31. Among other things, the regulations required the approval of the Oakland Airport manager before an exercise of First Amendment rights and limited leafletting to a period of four hours. In a brief opinion, we concluded: "Since the airport is public property ... free speech may be abridged only by regulations narrowly drawn to serve legitimate interests of the general public who use the airport." Kuszynski, 479 F.2d at 1131. We found the ordinance invalid and ordered the district court to "enjoin the enforcement of those portions of the ordinance not found to be reasonably necessary for the management of the airport." Id.
 
 
 17
 The Seventh Circuit's decision in CAMP, 508 F.2d 921, contains an extensive analysis of the forum issue which we find persuasive. The court in CAMP rejected many of the same arguments now before this court and held that the publicly owned and operated O'Hare Airport could not flatly bar the distribution of leaflets in public areas inside the terminal buildings.
 
 
 18
 The City of Chicago in CAMP argued that it had not opened O'Hare to free speech activities. The City claimed "that the public receives a limited invitation to use O'Hare Airport for travel purposes only." CAMP, 508 F.2d at 925. The Seventh Circuit found that these contentions were neither "supported by the evidence" nor "realistic." Id. The court analogized the airport terminal to traditional public forums and concluded the terminal was a public forum where First Amendment activity could not be totally banned.
 
 
 19
 [T]he plaintiffs do not here claim any right to distribute leaflets on airplanes or in other privately owned or leased places but only in the spacious, city-owned common areas which resemble those public thoroughfares which have been long recognized to be particularly appropriate places for the exercise of constitutionally protected rights to communicate ideas and information.
 
 
 20
 Id., citing Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939).
 
 
 21
 More recent appellate decisions are in accord with the holdings in Rosen, Kuszynski, and CAMP. In United States Southwest Africa/Nambia Trade & Cultural Council v. United States, 708 F.2d 760 (D.C.Cir.1983), the District of Columbia Circuit categorized the public areas of Washington National Airport (National) and Dulles International Airport (Dulles) as "public forums" for First Amendment purposes. Id. at 764. The District of Columbia Circuit quoted with approval the Seventh Circuit's analogy in CAMP of airport terminals to public thoroughfares. Id. The court also observed that "[w]hatever commonsense differences may exist in the forms of free speech allowable in airports, as opposed to parks and streets, an unusual consensus of judicial, legislative, and administrative opinion would classify the public areas of National and Dulles squarely within the public forum family." United States Southwest Africa, 708 F.2d at 766.
 
 
 22
 The Fifth Circuit similarly found the Dallas-Fort Worth Airport complex to be a public forum in Fernandes v. Limmer, 663 F.2d 619 (5th Cir.1981). In response to Dallas-Fort Worth's claim that "the airport ought not be regarded as a public forum," the Fifth Circuit stated: "It is now generally well established that airport terminals owned and administered by governmental entities are public forums in which efforts to regulate speech or religious activity must comport with First Amendment guarantees." Id. at 626. The Fernandes court concluded that "in view of the lack of restrictions on entry by the general public, and the commercial, street-like character of the terminal concourses ... the [Dallas-Fort Worth] terminal buildings must be treated as public forums." Id. at 627. See also Wolin v. Port of New York Authority, 392 F.2d 83, 89 (2d Cir.) (the interior of the Bus Terminal operated by the New York Port Authority is traditionally a place for exercise of First Amendment rights), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).
 
 
 23
 Since Rosen and Kuszynski, the law of this circuit has been that an airport complex is a traditional public forum. Every circuit which has confronted the issue has reached the same conclusion. We hold that the Central Terminal Area at LAX is a traditional public forum.
 
 
 24
 Because the CTA is a traditional public forum, the Board's resolution banning all First Amendment activity can be upheld only if it was narrowly drawn to accomplish a compelling governmental interest. Grace, 461 U.S. at 177, 103 S.Ct. at 1706; Cornelius, 105 S.Ct. at 3448. The Board sets forth only one governmental interest to justify the total exclusion of First Amendment activity in the CTA: "The Los Angeles City Charter requires the Board to operate all of its properties for promotion and accomodation of air navigation and air commerce and uses incidental thereto." The Board has not shown that its desire to limit the uses of the terminal facilities to airport-related purposes is sufficiently compelling to justify the uniform and absolute prohibition on all First Amendment activity in the CTA. In fact, the parties stipulated that "[i]n distributing the religious literature [in the CTA], Snyder was not blocking any entrance, exit, stairway, escalator, elevator, door, or otherwise inhibiting the free flow of pedestrian traffic [in the CTA]" and that "Snyder was not touching, annoying, blocking, obstructing, or otherwise harassing any other person present in the immediate vicinity of his location on the pedestrian walkway [in the CTA]." See Fernandes, 663 F.2d at 626 (that the passageways of the Dallas-Fort Worth Airport are crowded and narrow does not justify prohibiting Krishna followers from distributing literature and soliciting funds); Wolin, 392 F.2d at 91 (absolute prohibition of leafletting at the New York Port Authority's Bus Terminal cannot be defended on the ground that it would obstruct traffic).
 
 
 25
 The fact that the CTA is a traditional public forum does not preclude the Board from imposing restrictions on the distribution of leaflets. The Board is free to promulgate reasonable time, place, and manner restrictions on the distribution of literature in the CTA. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); CAMP, 508 F.2d at 926 (airport authorities may prohibit leafletting at check-in counters, arrival and departure gates, or any other areas where it is shown to substantially interfere with rapid and efficient airport operations). Because the 1983 resolution proscribes all First Amendment activity rather than setting forth reasonable time, place, and manner restrictions on such activity, it is unconstitutional on its face.
 
 IV. CONCLUSION
 
 26
 We hold that the distribution of literature by Jews for Jesus is protected speech and that the Central Terminal Area of the Los Angeles International Airport is a public forum. The governmental interests advanced by the Board are not sufficiently compelling to justify the total exclusion of those persons wishing to exercise free speech within the CTA.
 
 
 27
 The Board has conceded that, in the event Jews for Jesus prevail in this litigation, they are entitled to recover their attorneys' fees pursuant to 42 U.S.C. Sec. 1988. Since we have concluded that the Board's resolution is unconstitutional, Jews for Jesus are the prevailing parties and shall recover reasonable attorneys' fees as part of their costs. See Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Douglas v. City of Jeannette, 319 U.S. 157, 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943).